JS-3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY OLSEN,<br><br>Defendant. | Case No.: SACR 17-00076-CJC<br><br>**ORDER GRANTING DEFENDANT'S SUPPLEMENTAL MOTION TO DISMISS INDICTMENT WITH PREJUDICE [Dkt. 133]** |

# I.

"Even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).  This case presents questions about the constitutional rights of the accused during a global pandemic— specifically, the Sixth Amendment's guarantee of a right to a speedy trial and the Speedy Trial Act's codification of that right.  Undoubtedly, the COVID-19 pandemic has been one of the most challenging periods in recent memory.  With millions of infections and tragic deaths, COVID-19 thrusted the world into uncertainty and fear.  But there are some aspects of our society that, even in the face of a pandemic, cannot stop, pause, or suspend.  Chief among them is our legal system with the United States Constitution as its apex.  No matter the challenge, the Constitution's principles and guarantees must endure, and the judiciary must do what it can to protect them.

Sadly, the Central District of California abdicated its duty to defend the Constitution in its response to COVID-19.  In March 2020, when COVID-19 hit Southern California and the number of people infected began to dramatically increase, the Central District issued a general order temporarily suspending criminal jury trials during the early months of the pandemic.  But then, in August 2020, the Central District continued to suspend criminal jury trials *indefinitely* through another general order, believing that it was still necessary to mitigate the risks that the virus posed.  Jury trials did not resume until May 2021.  From beginning to end, the Central District's suspension of jury trials lasted fourteen months.  The Central District explained its choice to continue to suspend jury trials indefinitely in just four sentences in the three-page general order, decreeing that the "ends of justice" outweighed every individual's right, the government's right, and the public's right to a speedy trial.  Troublingly, the decision was not based on a directive or recommendation from a local public health official.  Nor was this decision based on a directive or recommendation from the Governor of California.  In fact, the August

general order provides no specific evidence, facts, or figures to justify the length of the delay it imposed.

Here is the reality.  As the government sought continuances in jury trials across the Central District because of the August general order, arguing that it was not safe to hold a trial, the government was convening the grand jury just floors down from where this Court sits.  As the suspension of jury trials dragged on for over a year in federal court, state courts across the Central District were open, holding jury trials safely and successfully for many months.  Essential and non-essential businesses alike operated during the pandemic, with appropriate modifications.  But the Central District refused to revisit its decision to suspend jury trials indefinitely, even when confronted with local public health guidance and ample evidence that jury trials could resume—and had resumed—safely.  That refusal violated the Constitution and the Speedy Trial Act.

So what happens when efforts to keep the public safe result in unconstitutional infringements upon our most sacred rights?  Should our legal system attempt to remedy the infringement when the evidence shows that it should never have happened in the first place?  Or should we just let it go?  The questions presented in this case are significant.  The answers are important and bear directly on the role of the judiciary in times of crisis and the rule of law itself.

The defendant here, Jeffrey Olsen, sought to invoke his right to a speedy trial during the pandemic.  Without proper justification, the Central District prevented him from invoking that right in violation of the Sixth Amendment and the Speedy Trial Act. The remedy for such violations is clear.  The indictment against him must be dismissed and dismissed with prejudice.

//

## II.

On July 6, 2017, Jeffrey Olsen was indicted with thirty-four counts of prescribing and distributing prescription substances, including oxycodone, amphetamine salts, alprazolam, and hydrocodone, without a legitimate medical purpose. (Dkt. 1.)  Mr. Olsen was also charged with one count of knowingly and intentionally furnishing false and fraudulent material information in an application submitted to the U.S. Drug Enforcement Agency. (*Id.*)  Mr. Olsen was arrested, booked, and arraigned, and pled not guilty to all counts. (Dkts. 8–10.)  He subsequently filed a Statement of Defendant's Constitutional Rights, in which he was informed that he was "entitled to a speedy and public trial by jury." (Dkt. 11.)  In accordance with the time limits prescribed by the Speedy Trial Act, trial was set for September 5, 2017. (Dkt. 10.)  Mr. Olsen was then released on a $20,000 bond. (Dkt. 14.)

Courtney E. Pilchman and Anita A. Kay, then Mr. Olsen's defense counsel, sought a series of continuances that pushed the trial date to June 18, 2019, explaining that they needed more time to prepare Mr. Olsen's defense due to the complexity of the charges and the vast amount of discovery in the case. (Dkts. 18–21, 26.)  A few months after obtaining the fourth continuance, counsel filed an *ex parte* application to withdraw as attorneys of record. (Dkt. 27.)  Ms. Pilchman explained that there were "serious differences of case strategy that c[ould] not be reconciled" between Mr. Olsen and counsel and that one of his attorneys, Ms. Kay, had "recently been hospitalized for serious medical reasons and [was] incapable of working." (*Id.* at 2.)  Attached to the application was a letter from Mr. Olsen in which he explained that he supported changing his representation due to: (1) a lack of funds for his defense; (2) dissatisfaction with the status of investigative discovery in his case; and (3) an overall lack of satisfaction with his representation. (*Id.* at 3.)  The Court granted the *ex parte* application and appointed a federal public defender as his counsel. (Dkt. 28.)

Dealing with a change of counsel, Mr. Olsen's newly appointed public defender requested the trial be continued to October 28, 2019.  (Dkt. 35.)  Mr. Olsen's new counsel later requested to continue the trial date further, explaining that upon her "initial review of the discovery," she "realized that the majority of files [that the government provided in discovery] were either not copied or corrupted," requiring her to wait for the government to send new copies.  (Dkt. 36 ¶ 3.)  She also explained that significant resources needed to be devoted to the case because "[t]he 35-count Indictment alleges conduct that spans over three years and includes forfeiture allegations.  The discovery contains roughly 77,000 files . . . includ[ing] recordings of undercover patient visits and thousands of prescriptions for patients named in the Indictment, as well as patients not named in the Indictment." (*Id.* ¶ 4.)  Counsel represented that since her initial appearance in the case, she had worked diligently, but "the sheer amount of discovery" was simply overwhelming, and she could not complete everything necessary in the amount of time until the then-set trial date.  (*Id.* ¶¶ 7–8.)  She also made clear that thousands of discovery documents were "handwritten prescription and payments" not "easily converted to a searchable format, so each page must be reviewed and renamed individually."  (*Id.* ¶ 8.)  Complicating matters further was a protective order that forbade Mr. Olsen from reviewing the tens of thousands of pages of discovery except in his attorney's office or with a member of his defense team.  (*Id.* ¶ 9.)  Defense counsel also represented that the government began investigating Mr. Olsen in January 2011, approximately six years before the indictment was filed, leaving plenty of time to investigate the case, whereas Mr. Olsen's defense counsel at that point had a grand total of four months.  (*Id.* ¶ 11.)  Over the government's objection, the Court granted the *ex parte* application and continued the trial to May 5, 2020.  (Dkts. 40, 42.)

On March 23, 2020, the parties stipulated to a seventh continuance due to defense counsel's other related pending trials and the need for additional time to prepare for the case.  (Dkt. 43.)  The Court approved the stipulation and set the trial for July 21, 2020.

(Dkt. 44.)  On June 18, 2020, the parties again filed a stipulation to continue the trial from July 21, 2020, to October 13, 2020, which the Court approved.  (Dkt. 46.)

When the COVID-19 pandemic hit Southern California and the number of people infected began to dramatically increase, the Central District began issuing a series of "emergency orders," each entered upon a unanimous or majority vote of Central District judges, suspending jury trials indefinitely.  Jury trials did not resume in the Southern Division of the Central District until fourteen months later—on May 10, 2021.[1]

The first order suspending jury trials in the Central District was issued in March 2020.  Neither the Court nor the parties dispute that it was appropriate and necessary to suspend jury trials during the early months of the pandemic.  The second order and the one most relevant to this case was General Order 20-09, issued on August 6, 2020 (hereinafter "G.O. 20-09").[2]  (Dkt. 129 [Defendant's Request for Judicial Notice], Ex. 6 [General Order No. 20-09 (C.D. Cal. Aug. 6, 2020)] ¶ 6(a), at 1.)  In G.O. 20-09, the Central District stated that "[u]ntil further notice, no jury trials will be conducted in

---

[1] Indeed, this Court presided over the first trial that took place in the Central District after the fourteen-month suspension was lifted.  The trial in *Barillas v. City of Los Angeles*, a civil rights action concerning the officer-involved shooting of Juan A. Barillas, began the same day that the suspension was lifted.  *See Barillas v. City of Los Angeles*, No. 18-08740 (Dkt. 122) (C.D. Cal. May 10, 2021).

[2] In connection with his motion to dismiss, Mr. Olsen asks the Court to take judicial notice of several exhibits.  (Dkt. 129.)  A court "may judicially notice a fact that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  For instance, a court "may take judicial notice of undisputed matters of public record, which may include court records."  *United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018).  A court may also take judicial notice of government documents on a government website as well as press releases of government agencies.  *See Pentecostal Church v. Newsom*, 985 F.3d 1128, 1132 n.1 (9th Cir. 2021); *Arce v. Douglas*, 793 F.3d 968, 975 n.3 (9th Cir. 2015).  And it is appropriate to take notice of responses to requests for public-records information.  *See Tran v. Sioux Honey Ass'n, Coop.*, 471 F. Supp. 3d 1019, 1022 n.3 (C.D. Cal. 2020) (taking judicial notice of documents produced in response to Freedom of Information Act requests).  All of Mr. Olsen's 148 exhibits fall into one of the identified categories above.  Exhibits 1 through 125 and Exhibits 133 to 148 are government documents on government websites or press releases of government agencies.  Exhibits 126 through 132 are responses provided by the superior courts for seven California counties in accordance with California Rule of Court 10.500, which permits public access to judicial administrative records.

criminal cases." (*Id.* ¶ 6.)  G.O. 20-09 provided no specific end date for that suspension, instead noting the intent to resume jury trials during Phase 3 of the District's Plan for Phased Resumption of Operations.  (*Id.* ¶ 1(c).)  The purported justification for the indefinite suspension of jury trials appears in just four sentences in one paragraph of G.O. 20-09.  In full, it provides:

> The Center for Disease Control and Prevention has warned that "in the coming months, most of the U.S. population will be exposed to this virus." The COVID-19 rates of infection, hospitalizations and deaths have significantly increased in the Central District of California in the last thirty days such that holding jury trials substantially increases the chances of transmitting the Coronavirus.  The Court concludes that conducting jury trials would also likely place prospective jurors, defendant, attorneys and court personnel at unnecessary risk.  Therefore, the Court finds that suspending criminal jury trials in the Central District of California because of the increase in reported COVID-19 infections, hospitalizations, and deaths serves the ends of justice and outweigh the interests of the public and the defendants in a speedy trial.

(*Id.* ¶ 6(a).)

At a status conference on August 20, 2020, the government advised the Court for the first time that it intended to file an *ex parte* application to continue the trial date pursuant to G.O. 20-09 and the Speedy Trial Act on the grounds that the "ends of justice [are] served by a continuance." (Dkt. 52 at 3.)  Mr. Olsen opposed the continuance, wanting to proceed to trial on October 13, 2020.  (*Id.*)  The government subsequently filed its *ex parte* application, requesting that the trial be continued from October 13, 2020, to December 1, 2020.  (Dkt. 54.)  On September 9, 2020, this Court denied the government's *ex parte* application, reasoning that an ends of justice continuance was not warranted because conducting jury trials safely was possible and Mr. Olsen was prepared to go to trial.  (Dkt. 67.)  The Court requested that the Chief Judge of the Central District direct the jury department to issue jury summonses in the hopes that the jury trial could

proceed despite G.O. 20-09. (*Id.*) Relying on the General Order, however, the Chief Judge refused to do so. (Dkt. 68.)

When the Central District failed to summon jurors for trial, Mr. Olsen a moved to dismiss the indictment based on violations of the Sixth Amendment and the Speedy Trial Act. (Dkt. 85.) After hearing from the parties, the Court dismissed with prejudice all charges against Mr. Olsen for violations of both. (Dkt. 98.)

The Court's ruling was based on three primary conclusions: (1) Congress intended the Speedy Trial Act's "ends of justice" exception to be rarely used and specifically limited in time; (2) an ends of justice continuance required that it be impossible for a court to hold a jury trial, but conducting a safe jury trial was both possible and safe due to various precautions that could be taken to curb the risk of infection;[3] and (3) G.O. 20-09's suspension of jury trials was not based on the facts of Mr. Olsen's particular case and was therefore insufficient under both the Sixth Amendment and the Speedy Trial Act to justify an "ends of justice" continuance. (*Id.*)

The government appealed. (Dkt. 110.) On April 23, 2021, a Ninth Circuit panel reversed and remanded. (Dkt. 114.) Mr. Olsen then petitioned the Circuit for rehearing en banc. (Dkt. 115.) On January 6, 2022, the Ninth Circuit denied the petition for rehearing en banc but amended its opinion, with two judges dissenting. (Dkt. 116);

---

[3] On appeal the Ninth Circuit appeared to issue its decision on the premise that this Court found that moving forward with Mr. Olsen's trial at the time that he requested would have been "unsafe" but not "impossible." *Olsen*, 21 F.4th at 1043 ("[T]he district court reasoned, 'conducting a jury trial during this coronavirus pandemic is possible' and the Central District had therefore 'sadly' denied Olsen his speedy-trial rights by suspending jury trials because they were 'unsafe,' but not 'impossible.'"). As explained in more detail later in this order, the Court found that conducting a jury trial would have been safe so long as proper precautions and safeguards were used, which were detailed on the record. (*See* Dkt. 52 at 18:23–19:19; *see also* Dkt. 98 at 11 ["Obviously, the state court has accomplished [holding jury trials] by taking numerous careful measures to ensure safety."].) These are the same safeguards and precautions that the government used when conducting grand jury proceedings just floors down from where this Court sits, as well as the same precautions the state judiciary used while holding jury trials throughout the Central District during the fourteen-month suspension.

*United States v. Olsen*, 21 F.4th 1036 (9th Cir. 2022).  The amended opinion found that this Court committed "clear error" in how it applied the factors enumerated in the Speedy Trial Act that courts must consider when analyzing requests for ends of justice continuances.  *Olsen*, 21 F.4th at 1045.  The Ninth Circuit also articulated a new multi-factor test for courts to use when analyzing whether an ends of justice continuance should be granted in the COVID-19 context (hereinafter the "*Olsen* factors"), in addition to the explicitly enumerated factors within the Speedy Trial Act.  *Id.* at 1046 (noting that "[t]he Speedy Trial Act and our case law are silent as to what non-statutory factors district courts should generally consider" before articulating the factors courts should use in the COVID-19 context); *id.* at 1056 (Murguia, J., & Christen, J., concurring) ("Our opinion simply anticipated that many similar cases will be presented as the pandemic wears on and offered guidance for district courts to consider.").

Now before the Court is Mr. Olsen's supplemental motion to dismiss the indictment against him pursuant to the new legal standard articulated by the Ninth Circuit.  (Dkt. 133 [hereinafter "Mot."].)  The government opposes Mr. Olsen's motion on both procedural and substantive grounds.  (Dkt. 136 [hereinafter "Opp."].)  The Court begins with a review of the applicable constitutional and statutory law, explaining that the test for whether to grant an ends of justice continuance is multi-faceted and largely discretionary.  The Court then addresses the government's procedural arguments concerning this Court's authority to evaluate Mr. Olsen's supplemental motion.  Finally, the Court applies the factors enumerated in the Speedy Trial Act as well as the *Olsen* factors applicable to Mr. Olsen's case.

## III.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const.

amend. VI.  The right to a speedy trial "has roots at the very foundation of our English law heritage" and "is one of the most basic rights preserved by our Constitution." *Klopfer v. North Carolina*, 386 U.S. 213, 224, 226 (1967).  Indeed, "[e]xcept for the right of a fair trial before an impartial jury, no mandate of our jurisprudence is more important" than a defendant's right to a speedy trial.  *Furlow v. United States*, 644 F.2d 764, 769 (9th Cir. 1981); *see Olsen*, 21 F.4th at 1049 ("[T]he right to a speedy and public jury trial provided by the Sixth Amendment is among the most important protections guaranteed by our Constitution, and it is not one that may be cast aside in times of uncertainty.").

The Sixth Amendment protects defendants by minimizing oppressive pretrial incarceration.  *See Klopfer*, 386 U.S. at 222; *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986).  It also protects the public, ensuring that the people see swift justice when crimes occur.  *See Barker v. Wingo*, 407 U.S. 514, 519 (1972) ("In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused."); *United States v. Lloyd*, 125 F.3d 1263, 1268 (9th Cir. 1997) ("[T]the right to a speedy trial belongs not only to the defendant, but to society as well.").

Whether a defendant's Sixth Amendment right to a speedy trial has been violated is governed by a four-factor test the Supreme Court articulated in *Barker*.  407 U.S. at 530.  Those factors include: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  *See United States v. Gregory*, 322 F.3d 1157, 1161 (9th Cir. 2003) (citing *Barker*, 407 U.S. at 530).  However, "none of the four factors identified above" are "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." *Barker*, 407 U.S. at 530.  "Rather, they are related factors and must be

considered together with such other circumstances as may be relevant." *Id.* That is, "these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

Congress specifically enacted the Speedy Trial Act in 1974 to give further effect to the Sixth Amendment's guarantee of a speedy trial. Pub. L. No. 93-619, 88 Stat. 2076; *see Furlow*, 644 F.2d at 798–69 (describing the Speedy Trial Act as the Sixth Amendment's "implementation"). The Act requires that a defendant's trial begin within seventy days of the filing of the indictment or the defendant's initial court appearance, whichever is later. 18 U.S.C. § 3161(c)(1). "The Act recognizes, however, that legitimate needs of the government and of a criminal defendant may cause permissible delays." *United States v. Daychild*, 357 F.3d 1082, 1090 (9th Cir. 2004). Accordingly, it provides that certain periods of time may be excluded from the seventy-day deadline. A court may exclude periods of delay resulting from mental health competency examinations, interlocutory appeals, pretrial motions, the unavailability of essential witnesses, and delays to which the defendant agrees. 18 U.S.C. § 3162(h)(1)–(6). The Act also contains a catchall category of excludable time. This provision, commonly referred to as the "ends of justice" exception, allows time to be excluded from a defendant's speedy-trial clock where a judge finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3162(h)(7)(A). "This provision permits a district court to grant a continuance to exclude the resulting delay if the court, after considering certain factors, makes on-the-record findings that the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial." *Zedner v. United States*, 547 U.S. 489, 498–99 (2006).

Congress intended the "ends of justice" exception to be "rarely used." *United States v. Nance*, 666 F.2d 353, 355 (9th Cir. 1982) (quoting the Act's legislative history);

*see United States v. Clymer*, 25 F.3d 824, 828 (9th Cir. 1994); *United States v. Jordan*, 915 F.2d 563, 565 (9th Cir. 1990).  Accordingly, all ends of justice continuances must "satisf[y] two requirements: (1) the continuance is 'specifically limited in time,' and (2) it is 'justified with reference to the facts [on the record] as of the time the delay is ordered.'"  *Clymer*, 25 F.3d at 828.  To ensure judicial discretion does not undermine the Act's important purpose, Congress enumerated non-exhaustive factors that courts must consider in determining whether to grant an "ends of justice" continuance.  *Id.*; *see id.* at 829 (explaining that "the 'ends of justice' exclusion . . . may not be invoked in such a way as to circumvent the time limitations set forth in the Act").  Those factors include, as relevant here, "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice."  18 U.S.C. § 3161(h)(7)(B)(i).

At its core, an ends of justice continuance requires courts to engage in careful and delicate balancing.  In doing so, "district courts have broad discretion to consider any factors based upon the specific facts of each case" and to assign each factor its appropriate weight.  *Olsen*, 21 F.4th at 1046.

When a request for an "ends of justice" continuance arises in the context of the COVID-19 pandemic, the Ninth Circuit has articulated several other factors to evaluate to determine whether the ends of justice outweigh the best interests of the defendant and the public, in addition to the enumerated factors.  *Olsen*, 21 F.4th at 1047.  Those factors include: (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular whether the defendant is accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are

dismissed; and (7) whether the district court has the ability to safely conduct a trial. *Id.* at 1046.

The party requesting the ends of justice continuance has the burden to establish it is justified under Speedy Trial Act. *See, e.g.*, *United States v. Burrell*, 634 F.3d 284, 287 (5th Cir. 2011) ("[T]he Government bears the burden of establishing the applicability of this [ends of justice] exclusion, as 'the trial court [did not] independently recognize[ ] the need for such a delay' and the Government is 'the party seeking to benefit from the delay.'") (citations omitted); *Olsen*, 21 F.4th at 1078 (Collins, J., dissenting) ("Because the *Government* was the one moving for a continuance, it had the burden to establish that the continuance was justified under the Act.") (emphasis in original).[4]  But "[t]he defendant has the burden of proving that the delay meets the criteria for dismissal." *United States v. Medina*, 524 F.3d 974, 980 (9th Cir. 2008).

## IV.

Before analyzing Mr. Olsen's supplemental motion under the new legal standard set forth by the Ninth Circuit, the Court must address a threshold issue: whether the Ninth Circuit's mandate permits the Court to evaluate Mr. Olsen's supplemental motion to dismiss the indictment under the new legal standard.  The government dedicates much of its opposition to arguing that the mandate gave explicit instructions to this Court "to reinstate Olsen's indictment, grant an ends of justice continuance, and set this case for trial" and that it would therefore be error to consider Mr. Olsen's supplemental motion. (Opp. at 4–11 [citing *Olsen*, 21 F.4th at 1049].)  The government also asserts that "the law of the case doctrine" precludes the Court from revisiting any of the Ninth Circuit's holdings.  (*Id.*)  Neither argument is persuasive.

---

[4] Indeed, neither party disputes that the government bears the burden to show that an ends of justice continuance is warranted here.

Though the Ninth Circuit held that this Court "committed clear error" in its Speedy Trial Act analysis, the scope of the Ninth Circuit's remand is not as narrow as the government contends.  The *Olsen* mandate provides: "The judgment of the district court is REVERSED and REMANDED with instructions to reinstate Olsen's indictment, grant an *appropriate* ends of justice continuance, and set this case for a trial."  *Olsen*, 21 F.4th at 1048 (italics emphasis added).  Granting an "appropriate" ends of justice continuance, however, necessarily involves a determination of whether a continuance is appropriate to grant in the first place.  Reading the mandate alongside the panel's concurrence in the Ninth Circuit's denial of Mr. Olsen's petition for rehearing en banc makes this clear.  There, two judges from the original panel stated explicitly that in issuing the panel opinion, the Circuit "did not predict or foreclose further Speedy Trial Act motions practice in this case."  *Olsen*, 21 F.4th at 1049 (Murguia, J., and Christen, J., concurring).

The concurrence's clarification that further Speedy Trial Act motions were not foreclosed in this case adheres to general principles governing remands when a district court is reversed for clear error.  "When a district court applies the wrong legal standard," the appellate court will "ordinarily remand the case so that it may apply the correct one in the first instance."  *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) (cleaned up); *see Shirk v. United States ex rel. Dep't of Interior*, 773 F.3d 999, 1008 (9th Cir. 2014) ("The proper recourse for courts of appeals confronted with district court findings of questionable sufficiency is ordinarily to remand for proper first instance factfinding.") (cleaned up).  This general rule applies to deficient Speedy Trial Act findings.  *See, e.g.*, *United States v. Lewis*, 518 F.3d 1171, 1177 (9th Cir. 2008) (remanding for "specific findings as to which periods are excludable under the STA").  The mandate requiring this Court to grant an *appropriate* ends of justice continuance, the concurrence's clarification that the Ninth Circuit did not foreclose further Speedy Trial Act motions in the case, and the general principle that when reversed for clear error district courts are to apply the

correct legal standard as instructed by the appellate court together make clear that the Court may properly apply the new legal standard to Mr. Olsen's case.[5]

That the panel did not apply the new legal standard it articulated to Mr. Olsen's case bolsters the Court's conclusion regarding the scope of the Ninth Circuit's remand. The government concedes this point, arguing that the Circuit "did not explicitly address these factors in its opinion[,]" but "decided these factors by implication[.]"  (Opp. at 7); *see also Olsen*, 21 F.4th at 1077 (Collins, J., dissenting) ("[T]he panel conspicuously did not remand for the district court to apply these factors; instead, it remanded with explicit instructions to 'grant' an appropriate continuance and set a new trial date.") (citations omitted).  Thus, in considering Mr. Olsen's supplemental motion, this Court is not revisiting conclusions the Ninth Circuit made but is the first to evaluate whether under the Circuit's new legal standard the government met its burden of proving an ends of justice continuance was warranted.

Finally, and most importantly, the Ninth Circuit's opinion rested upon the premise that this Court found conducting jury trials at the time Mr. Olsen wished to go to trial would have been unsafe.  Specifically, the Circuit stated that this Court found that "the Central District had therefore '[s]adly' denied Olsen his speedy-trial rights by suspending jury trials because they were 'unsafe,' but not 'impossible.'"  *Olsen*, 21 F.4th at 1043. Unfortunately, the Court's statement on this issue was misconstrued.  To the contrary, the Court explained at length the measures it would have taken to ensure that jury trial proceedings would have been safe.[6]  (*See* Dkt. 98 at 11 ["Obviously, the state court has

---

[5] The Ninth Circuit has remanded in another case with similar Speedy Trial Act questions presented. *See United States v. Reyes*, Nos. 21-50045, 21-40073 (9th Cir. July 5, 2022) (order remanding to the district court to reconsider Reyes' motion to dismiss under the new legal standard set forth in *Olsen*).

[6] Mr. Olsen is one of at least six defendants before the Court challenging the Central District's indefinite suspension of jury trials. *See United States v. Recinos*, No. 19-cr-00724-CJC (C.D. Cal. Sept. 2, 2020); *United States v. Henning*, No. 16-cr-00029-CJC-7 (C.D. Cal. Jan. 19, 2021); *United States v. Nicholson*, No. 16-cr-00470-CJC-1 (C.D. Cal. Jan. 20, 2020); *United States v. Ware*, No. 20-cr-00110-CJC (C.D. Cal. Jan 21, 2021; *United States v. Reyes*, No. 19-cr-00740-CJC (C.D. Cal. Feb. 23, 2021).  In each of

accomplished [holding jury trials] by taking numerous careful measures to ensure safety."].)  Nor would this Court have denied the government's request for a continuance had the government met its burden and presented evidence that the precautions the Court planned to take—coincidentally, the very precautions the government was actively using to conduct grand jury proceedings—were not adequate safeguards against the risks of the coronavirus.  Under no circumstance would this Court have conducted a jury trial for Mr. Olsen if it thought that doing so was unsafe.  The Court therefore has no difficulty concluding that the scope of the remand allows this Court to consider and apply the Ninth Circuit's new legal standard to Mr. Olsen's supplemental motion to dismiss his indictment.  With that threshold issue decided, the Court turns to the Speedy Trial Act's enumerated factors as well as the *Olsen* factors.[7]

## V.

## A.

With respect to the first enumerated "ends of justice" factor, the government vehemently argues that the failure to grant a continuance would have made the continuation of the proceedings impossible at the time Mr. Olsen invoked his right because of G.O. 20-09's ban on jury trials.  This position supports an appropriate continuance only if G.O. 20-09 itself conforms to the strictures of the Speedy Trial Act.  General orders, like a district's local rules, may not conflict with federal law, let alone the Constitution.  *See* 18 U.S.C. § 2071(a) ("The Supreme Court and all courts established by

---

these cases, the Court detailed on the record the precautions and measures it would have implemented to ensure the proceedings were safe.

[7] Both the government and Mr. Olsen provide the Court with a separate analysis to determine whether Mr. Olsen's Sixth Amendment right was violated (as opposed to his rights under the Speedy Trial Act). They cite *Barker v. Wingo*, which explains that courts should balance the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530. The analysis of these factors parallels the analysis the Court makes under the Speedy Trial Act so there is no need for the Court to conduct a separate analysis.

Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure[.]”); *Marshall v. Gates*, 44 F.3d 722, 724–25 (9th Cir. 1995) (noting that a district’s local rules, though “laws of the United States” may not conflict with federal law); *see also Williams v. United States District Court*, 658 F.2d 430, 435 (6th Cir. 1981) (“A local rule is inconsistent with federal rules and statutes if it alters those aspects of the litigation process which bear upon the ultimate outcome of the litigation, thereby frustrating federal policies.”).[8]  And the government offers nothing more than tautological reasoning, implicitly arguing that the Central District may properly rule by edict.  This is simply not the law.  If G.O. 20-09 is the source or the reason behind a defendant’s inability to receive a trial, G.O. 20-09 must conform with federal law.

But G.O. 20-09 does not—for four glaring reasons.  First, a general order cannot be treated as a blanket waiver of requirements under the Speedy Trial Act’s ends of justice exception.  Rather, the Ninth Circuit has articulated a detailed, fact-specific, and defendant-specific test for a continuance under that exception.  G.O. 20-09 simply makes no mention of any of the factors that any court is required to consider under that test.  Second, G.O. 20-09 ordered that jury trials be suspended *indefinitely*, even though an “ends of justice” continuance must be limited in time pursuant to established Ninth Circuit law.  Third, G.O. 20-09 rested on outdated and incomplete information on whether a trial could be conducted safely.  Fourth, G.O. 20-09 is the most drastic and extreme step the Central District could have taken to achieve its goals.  These deficiencies compel this Court to afford G.O. 20-09 little weight in its analysis of whether an ends of justice continuance is justified here.

---

[8] It is worth noting that General Orders can have equal, if not more, impact on an individual’s party’s rights as Local Rules may have.  Yet General Orders are not required to go through the same public notice and comment requirements that a district’s promulgated Local Rules must go through.  *See* 28 U.S.C. § 2071(b) (“Any rule prescribed by a court, other than the Supreme Court, under subsection (a) shall be prescribed only after giving appropriate public notice and an opportunity for comment.”); *United States v. Terry*, 11 F.3d 110, 113 (9th Cir. 1993).

**i.**

As the Ninth Circuit has now made clear, an ends of justice continuance in the COVID-19 context requires a careful balancing of several factors and G.O. 20-09 considers none of them.  Among those factors are: (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular, whether the defendant is accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are dismissed; and (7) whether the district court has the ability to safely conduct a trial.  *Olsen*, 21 F.4th at 1046.  Rather than address these factors, G.O. 20-09 summarily decreed that in-person proceedings were not safe, stating generally that "the Centers for Disease Control and Prevention and other public health authorities have advised the taking of precautions to reduce the possibility of exposure to the virus and slow the spread of the disease" and since "[t]he COVID-19 rates of infection, hospitalizations and deaths have significantly increased in the Central District of California in the last thirty days . . . holding jury trials substantially increases the chances of transmitting the Coronavirus."  (G.O. 20-09 ¶ 6(a), at 1.)

G.O. 20-09 identifies no defendant.  It provides no guidance or information on how to proceed when a defendant is in custody and has been detained for a significant period of time.  It does not provide guidance on what to do when the charges that a defendant faces are not particularly serious.  And it makes no mention of what to do when a defendant has invoked their speedy trial rights since the case's inception.  Nor does it mention the Speedy Trial Act's enumerated factors, including whether the failure to grant a continuance would make a continuation of the proceedings impossible or result in a

miscarriage of justice.  In brief, it completely ignores almost all the relevant factors that the Ninth Circuit and Congress have mandated that this Court consider when deciding whether to grant an "ends of justice" continuance.  (*See id.*)

Rather than address these issues, G.O. 20-09 makes conclusory findings concerning why the ends of justice purportedly outweigh every criminal defendant's right to a speedy trial.  In *full*, G.O. 20-09's ends of justice continuance analysis provides:

> The Center for Disease Control has warned that "in the coming months, most of the U.S. population will be exposed to this virus."  The COVID-19 rates of infection, hospitalizations and deaths have significantly increased in the Central District of California in the last thirty days such that holding jury trials substantially increases the chances of transmitting the Coronavirus.  The Court concludes that conducting jury trials would also likely place prospective jurors, defendant, attorneys and court personnel at unnecessary risk.  Therefore, the Court finds that suspending criminal jury trials in the Central District of California because of the increase in reported COVID-19 infections, hospitalizations, and deaths *serves the ends of justice and outweigh the interests of the public and the defendants in a speedy trial*.

(*Id.* ¶ 6 [emphasis added].)

The government would have this Court treat these four sentences as a one-size-fits-all approach to defendants who invoke their right to a speedy trial during an indefinite suspension of jury trials.  Doing so is contrary to the test articulated in *Olsen* and on its face cannot serve as a method for the government, nor the Court, to avoid the Speedy Trial Act's requirements.  The natural result of treating G.O. 20-09 as anything more than an administrative decision would mean that any time the Central District wished to suspend jury trials, with or without proper justification, it could do so through majority vote, completely circumventing the precise, detailed, and exacting rules the Speedy Trial Act lays out to ensure that a defendant's Sixth Amendment right is not violated.  That cannot be the result that Congress or our Founders intended.  *See Clymer*, 25 F.3d at 829.

**ii.**

Yet there is more missing from G.O. 20-09 than just a thorough legal analysis. Also missing are any facts, figures, or statistics to support the Central District's conclusory statement that conducting jury trials would put the parties, the jury, court staff, and the public at "unnecessary risk." G.O. 20-09 appears to rely only upon an unspecified recommendation from the CDC. But there is no indication in G.O. 20-09 that the CDC's recommendation was designed or intended to apply to essential court proceedings. Nor does G.O. 20-09 provide statistics on the specific increases in infections, hospitalizations, or deaths to which it referred. G.O. 20-09 does not consider any safety measures or precautions that courts may have taken to abate the risks that the virus presented, such as masks and social distancing inside courtrooms. Also absent is any sign that the Central District was even willing to consider such measures. Worse, there is no suggestion that the Central District intended to re-evaluate its position regarding the suspension of jury trials in any systematic, routine, or predictable way that would have relieved some of the uncertainty surrounding the suspension of a constitutional right, leaving parties with little more than the ability to guess, hope, and pray that their trial would someday come.

The dearth of factual and legal findings in G.O. 20-09 is, on its own, reason enough to conclude that that G.O. 20-09 cannot act as a blanket, court-imposed waiver of a criminal defendant's speedy trial rights and that it would be improper to give it any weight in the Court's analysis. *See Olsen*, 21 F.4th at 1072 (Collins, J. dissenting) ("If the asserted source of the impossibility is a General Order of the court itself, then *that* order must be subject to, and comply with, the strictures of the Act.") (emphasis added).

//
//

**iii.**

Moreover, G.O. 20-09's *indefinite* suspension of jury trials is a separate and independent reason to afford the government's argument little weight.  G.O. 20-09 states only that jury trials would resume "upon further notice" of the Central District.  Further notice would not arrive for fourteen months after the initial suspension.  But at the time the government requested its continuance, neither party had any real sense of just how long the suspension would drag on.  This cannot be overlooked.  Congress intended the "ends of justice" provision to be "rarely used."  *Nance*, 666 F.2d at 355; *see Clymer*, 25 F.3d at 828; *Jordan*, 915 F.2d at 565.  And true to Congress's intent, the Ninth Circuit has "made clear that a district court may grant an 'ends of justice' continuance *only* if it satisfies two requirements: (1) the continuance is '*specifically* limited in time', and (2) it is 'justified [on the record] with reference to the facts as of the time the delay is ordered.'"  *Clymer*, 25 F.3d at 828 (emphasis in original).  The reasoning behind these requirements could not be clearer: "the 'ends of justice' exclusion . . . may not be invoked in such a way as to circumvent the time limitations set forth in the Act."  *Clymer*, 25 F.3d at 829.[9]

Yet on its face, G.O. 20-09 does not comply with a prerequisite that the Ninth Circuit requires ends of justice continuances to have, *i.e.*, that it be specifically limited in time.  *Id.*  The government's argument that G.O. 20-09 was nevertheless limited in time because the Central District always intended to resume trials does not solve the problem.  That is because the impact of an indefinite suspension must be evaluated from the point

---

[9] G.O. 20-09 explained that the Central District would resume normal operations in three phases, with jury trials resuming in the last phase, Phase 3.  Yet the Federal Judiciary's COVID-19 recovery guidelines state explicitly that jury trials, like the one Mr. Olsen requested, could resume during Phase 2, which the Central District was in when Mr. Olsen invoked his speedy trial right.  *See Federal Judiciary COVID-19 Recovery Guidelines* 18 (2020), https://www.fedbar.org/wp-content/uploads/2020/04/Federal-Judiciary-COVID-19-Recovery-Guidelines.pdf (noting that, with respect to Phase Two, "More grand and petit jury proceedings can begin . . .  Continue to **RELY ON LOCAL PUBLIC HEALTH AND CDC GUIDANCE** to inform your local medical based decisions." (emphasis in original)).

of view of those whom it most impacts, the defendants. At the time G.O. 20-09 took effect, the Central District failed to provide any kind of estimation of when jury trials would resume or when it would reevaluate the safety of jury trials. The suspension could have lasted another day or another decade and would have gone unchecked so long as a majority of Central District judges continued to support the suspension.

The law does not permit this. The Constitution guarantees a criminal defendant a right to a speedy trial. The Speedy Trial Act codifies that right. An ends of justice continuance cannot be indefinite. And a defendant's right to a speedy trial is violated when his ability to go to trial is "to be determined," even when it comes at the hands of a district-wide order with the support of a majority of the Central District's judges.

### iv.

Even more troubling, the Central District did not consider less drastic and extreme measures than an indefinite suspension. Given the gravity of this omission, the Court exercises its discretion to consider this failure as a separate subfactor in its impossibility analysis. The Central District had several options to allow defendants to invoke their speedy trial rights while keeping juries, parties, staff, the court, and the public safe. For instance, it could have consulted with its colleagues on California's state courts, who managed to resume trials safely not just in Orange County but throughout the State, months before the Central District did so. (*See* Mot. at 45–100.)

Indeed, California's state judicial system's response to the COVID-19 pandemic was markedly different from the Central District's response, with California's Judicial Council explicitly stating at the very beginning of the pandemic in March 2020 that "[g]iven the length of time the pandemic may impact the state, the courts cannot delay all proceedings indefinitely and must find a way to continue to provide the most critical

services." (Dkt. 129, Ex. 21 [Judicial Council of California, Report to Judicial Council, March 28, 2020] at 6.)  The Chief Justice of the California Supreme Court routinely updated the public on the status of carrying out necessary court services with a particular emphasis on "balancing the constitutional due process of rights in criminal proceedings with the health and safety of these defendants, the public, court staff, judicial officers, attorneys, witnesses, jurors, and others present at these proceedings, among other considerations," rescinding an earlier order that had extended the time to bring those charged with a felony before the magistrate.  (Dkt. 129, Ex. 24 [Judicial Council of California, Statewide Emergency Order by Tani G. Cantil-Sakauye, June 10, 2020] at 2.)

Adhering to the Chief Justice's guidance, Orange County Superior Court ("OCSC") resumed jury trials in June 2020, approximately three months after its initial closure.  (Dkt. 129, Ex. 77 [OCSC, Implementation Order Re Emergency Order, March 16, 2020], Ex. 78 [OCSC, Amended Administrative Order No. 20/09], Ex. 81 [May 21, 2020, OCSC, "Orange County Superior Court Announces Soft Re-Opening"], Ex. 82 [May 22, 2020, OCSC, "Jury Service Starting May 29, 2020 and After"].)  In the three months that jury trials did not take place, OCSC: (1) established procedures to determine whether good cause existed to conduct jury trials during the suspension period; (2) circulated a memorandum with detailed "recommendations for resuming jury operations while maintaining social or physical distancing practices"; (3) limited the number of jurors reporting at any one time; (4) arranged for frequent disinfection of jury rooms; (5) enforced social distancing and face-mask use in all courthouses; (6) circulated a memorandum with detailed plans for a "soft reopening approach" with the limited purpose of conducting criminal jury trials and expanding felony preliminary hearings while "ensur[ing] a safe and healthy environment"; and (7) informed potential jurors and the public that it had developed a plan that prioritized their health and safety, kicking off OCSC's "Safe Access to Justice Initiative," a program designed to assure strict enforcement of safety precautions to protect jurors and members of the public who enter

Court facilities.  (Dkt. 129, Ex. 79 [April 2, 2020, OCSC, Administrative Order No. 20/11 "Good Cause for Jury Trials"], Ex. 97 [April 22, 2020, OCSC, Memo, "Resuming Jury Operations], Ex. 98 [May 21, 2020, OCSC, Memo, "Resuming Jury Operations"], Ex. 83 [May 22, 2020, OCSC, News Release "Court to Resume Jury Trials"].)  OCSC in its public guidance also informed the public: "Justice cannot be done without your participation.  Trial by jury is more than just a fundamental Constitutional right.  It is a critical safeguard of our individual liberties."  (Dkt. 129, Ex. 84 [OCSC "Safe Access to Justice"].)

OCSC's efforts, and those of its peer courts throughout the Central District region, paid off.  By October 20, 2020, OCSC held 100 jury trials.  (Dkt. 129, Ex. 90 [OCSC, News Release, "Orange County Superior Court Celebrates Special Juror Appreciation Week October 26–30, 2020"].)  A few months later in February 2021, the number of jury trials grew to 174.  (Dkt. 129, Ex. 127 [February 25, 2021, OCSC's Response to "Request for Information and Records Under Court Rule 10.500"].)  And OCSC was not the exception to the rule.  Los Angeles Superior Court resumed jury trials in September 2020 and held ninety jury trials from then to February 16, 2021.  (Dkt. 129, Ex. 126 [February 16, 2021, Superior Court of California, County of Los Angeles' Response to Request for Administrative Records].)  Riverside Superior Court resumed jury trials in May 2020 and held ninety-eight jury trials from its initial reopening to March 11, 2021. (Dkt. 129, Ex. 128 [March 11, 2021, Superior Court of California, County of Riverside's Response to Request for Information].)  San Bernardino County Superior Court held seventy-five jury trials by February 2021 while San Luis Obispo Superior Court completed seventeen, Ventura County Superior Court twenty-one, and Santa Barbara Superior Court six. (Dkt. 129, Exhibits 129–132 [Superior Courts Respective Responses to Requests for Administrative Records].)  In sum, during the first year of the pandemic, the state courts for the seven counties within the Central District held at least 491 jury trials.  The Central District held none.

It was not just OCSC operating in Orange County when Mr. Olsen invoked his speedy trial right.  At the time, the Internal Revenue Service, the Social Security Administration, and other federal agencies in Orange County were open and their employees were showing up for work.  Police, firefighters, and other first responders in Orange County were also all operating.  Hospitals and medical offices in Orange County were open to patients, and medical professionals were showing up for work.  Grocery stores, hardware stores, and all essential businesses in Orange County were open and their employees were showing up for work.  Orange County restaurants were open for outdoor dining and reduced-capacity indoor dining.  Nail salons, hair salons, body waxing studios, massage therapy studios, tattoo parlors, and pet groomers in Orange County were open, even indoors, with protective modifications.  Children in Orange County were returning to indoor classes at schools, with modifications.  Even movie theaters, aquariums, yoga studios, and gyms in Orange County were open indoors with reduced capacity.  Yet the federal courthouse in Orange County somehow remained closed for jury trials.

G.O. 20-09 simply displayed little to no consideration of a defendant's right to a speedy trial or any interest in considering appropriate measures and feasible precautions that would have allowed the Central District to resume jury trials safely.  Like the state judiciary, G.O. 20-09 could have considered differences in COVID-19 statistics between the different regions the Central District covers, given that Orange County COVID-19 statistics were far better than Los Angeles' at the time that the government requested a continuance.[10]  Such region-specific considerations would have more closely aligned to the needs of the fact-specific and defendant-specific analysis that the Speedy Trial Act

---

[10] Indeed, the Federal Judiciary's COVID-19 Recovery Guidelines provide that districts should use their "local public health agency's recommendations and information to inform" the district's decision about their operations and that the district should "[c]onsider guidance being given to other agencies in your building and in your community (including DOJ) and the decisions they make in your locality . . . **WHEN MAKING OPERATIONAL DECISIONS**."  *Federal Judiciary COVID-19 Recovery Guidelines*, *supra* note 9, at 5, 10 (emphasis in original).

and *Olsen* require when considering whether an ends of justice continuance should be granted.  The Central District could have also done the bare minimum and agreed to re-evaluate the suspension periodically, similar to the state judiciary's response, based upon guidance from the CDC and any other public health agency with the goal towards reopening safely.[11]  Instead, the Central District's solution was an outright ban, without any regard for the Sixth Amendment rights that G.O. 20-09 trampled.

**B.**

G.O. 20-09 also raises issues under a separate *Olsen* factor—whether it was safe to conduct a jury trial at the time Mr. Olsen invoked his right to a speedy trial.  By far, the most troubling aspect of the government's defense of G.O. 20-09 is its remarkable, implicit concession that G.O. 20-09's findings regarding the safety of conducting jury trials were wrong.  Indeed, neither Mr. Olsen nor the government contend that holding jury trials was unsafe, with the government going as far to say that ***the safety factor weighs in Mr. Olsen's favor***.[12]  (Opp. at 15 [the safety factor "is at most one factor in defendant's favor"].)  The parties are correct.  This Court, at the time Mr. Olsen requested to go to trial, could have conducted the trial safely.  In fact, the Court detailed to both parties at length on the record each and every measure that it planned to take to

---

[11] In fact, when the Central District initially stopped calling jurors for service, it did so for a limited period, until April 13, 2020.  (Dkt. 129, Ex. 1 [Central District of California, Amended General Order 20-02 (C.D. Cal. March 17, 2020)] ¶ 2.)  The same is true for the initial suspension of grand jury proceedings, which was limited to May 4, 2020.  (Dkt. 129, Ex. 3 [Central District of California, Order of the Chief Judge, 20-044] ¶ 1.)  And the Federal Judiciary's Covid-19 guidelines explicitly stated that the district should "**REEXAMINE AND UPDATE** court orders and notices as appropriate." *Federal Judiciary COVID-19 Recovery Guidelines*, *supra* note 9, at 10 (emphasis in original).

[12] Of course, the government's concession makes sense.  Given that the government was convening the grand jury just floors down from where this Court's courtroom sits, using the same precautionary measures the Court detailed on the record, if the government were to argue that it was not safe to hold jury trials in this Court's courtroom, it would necessarily have to argue that the government's own grand jury proceedings were also not safe.  The Court has not been provided a reason to distinguish between the two.  Attached as Exhibit A to this order is a summary chart detailing the number of indictments the grand jury returned in the Southern Division of the Central District from June 24, 2020 to December 9, 2020.

ensure that the risks were mitigated.  (*See, e.g.*, Dkt. 52 at 18:23–19:19; Dkt. 98 at 11 ["Obviously, the state court has accomplished [holding jury trials] by taking numerous careful measures to ensure safety."].)

In the Court's view, this factor in the *Olsen* test bears significant weight.  If holding safe jury trials was possible, there is no justification to continue the jury trial suspension, let alone indefinitely.  But given the confusion surrounding this Court's findings on whether it was safe to conduct a jury trial at the time Mr. Olsen requested, the Court takes the time to elaborate upon the safety measures that this Court would have taken to ensure the safety of the jurors, the parties, court staff, and the public.

Every aspect of conducting a jury trial at the time Mr. Olsen requested would have been planned to mitigate the risks of exposure to the coronavirus.  From summoning jurors to jury deliberations, this Court was prepared to put into place science-based and public-health-expert-approved precautions that were proven, tried, and tested not only by OCSC but by the grand jury operations, which were happening just floors down from this Court's courtroom in the Santa Ana federal courthouse.

To summon the jurors necessary to conduct a trial, the Clerk of the Court would have implemented the same procedures that it currently uses to summon jurors.  Attached to the traditional jury summons would have been a letter from the Clerk of the Court.[13] That letter would have informed each summoned juror of the important health and safety precautions that the Court implemented to mitigate the risk posed by COVID-19, including: (1) requiring all individuals to wear face coverings to enter the courthouse; (2) placing social distancing signage and demarcations throughout the courthouse, including in jury assembly areas and courtrooms; (3) providing personal protection equipment to each juror; (4) arranging for enhanced courthouse cleaning throughout the

---

[13] Attached to this order as Exhibit B is a copy of the letter from the Clerk of the Court.

day; and (5) reducing building occupancy by holding telephonic and video proceedings when possible and maximizing telework by staff.  The letter would have also provided that jurors could request to postpone jury duty or that they be excused from jury service if particularly impacted by the virus.  The summons would have further stated clearly that jurors are not to report to the courthouse if they have symptoms of COVID-19 or if they have tested positive for COVID-19 within fourteen days of their scheduled report date.

Those jurors that were found qualified for service would have been sent a supplemental questionnaire that screened for signs of COVID-19.[14]  The questions would have asked jurors about their recent exposure to COVID-19, any COVID-19 symptoms they may be experiencing, whether they would like to be considered for deferral of service because they are at higher risk of developing serious health complications from COVID-19, whether they live with or provide direct care for a vulnerable person or work in the medical field, and whether they have children at home who require direct supervision due to school and/or daycare closures.  If jurors answered "yes" to any of those questions, their questionnaire would have been reviewed for deferral of jury service.

Once prospective jurors arrived at the courthouse, they would have convened in the jury assembly room located on the first floor of the Santa Ana federal courthouse.  The Santa Ana courthouse would have reduced seating capacity in the jury assembly room from one hundred and fifty-two people to fifty-five people.  And the Clerk's office would have taken the following steps to accommodate jurors: (1) place plexiglass barriers on the jury counter; (2) decrease seating and modify the layout in the jury assembly room for social distancing purposes; (3) place hand sanitizer units in the jury assembly room; (4) require face coverings; (5) require judges wishing to address jurors to do so from the jury assembly room; (6) decide jurors' requests to be excused or postponed in the jury

---

[14] Attached to this order as Exhibit C is a copy of the supplemental questionnaire.

assembly room, thereby decreasing the number of jurors in the courtroom for voir dire;
(7) prohibit coffee and tea service; (8) provide individual refreshments instead;
(9) decrease the number of jurors reporting to the courtroom at one time; (10) provide
overflow space for voir dire; (11) provide video feed to overflow spaces; (12) ensure
personal protective equipment was available in the jury assembly room, courtrooms, and
jury rooms; (13) offer face shields to prospective jurors to wear in addition to masks; and
(14) limit the number of jurors in the elevators.[15]

Once inside the courtroom, the Court would have taken similar precautionary
measures.  Plexiglass would have been placed in front of the jury box, witness stand,
plaintiff's table, defendant's table, lectern, courtroom deputy's desk, courtroom reporter's
desk, and the judge's bench.  Masks would have been required to be always worn by all
present, except by a witness testifying on the witness stand that was enclosed by extended
plexiglass.[16]  Jurors would have been socially distanced, placed six feet apart in the
public gallery area of the courtroom.  Each juror would have also been provided with
their own personal protective equipment, including hand sanitizer, multiple face masks,
and other protective gear.[17]

The Court would have also taken steps to ensure that the jurors deliberated in a
room large enough to ensure that each juror could be socially distanced.  Fortunately, the
Santa Ana federal courthouse has chambers to spare, and the juries would have been able
to meet safely and comfortably in a vacant senior judge's chambers to abide by all the
necessary COVID-19 precautions.[18]

---

[15] This information was provided by the Clerk's Office in the Southern Division of the Central District.
[16] Attached to this order as Exhibit D is a picture of the witness stand extended plexiglass the Court used
during the pandemic.
[17] Attached to this order as Exhibit E is a picture of the personal protective equipment each juror would
have been provided during jury service as part of this Court's COVID-19 precautions.
[18] Attached to this order as Exhibit F is a picture of the empty Santa Ana courtroom chambers that
would have been used as the jury room as part of this Court's COVID-19 precautions.

The safety of these measures and precautions were also tried and tested not only by every superior court in the Central District's region but by the government, which convened the grand jury just floors down from this Court's courtroom in a room less than half the size of this Court's courtroom.  This is significant because the grand jury consists of at least sixteen jurors.  To indict a defendant, the government presumably brought in and examined multiple witnesses before the grand jury.  Staff was also likely present to facilitate the proceedings.  And all of this was done in a room that was not as spacious and well-ventilated as this Court's courtroom.  Indeed, the grand jury room's dimensions were 20 feet by 26 feet, nearly half the size of this Court's courtroom, which measures 48 feet and 6 ½ inches by 44 feet and 4 inches, with much higher ceilings and better ventilation.[19]

Given the legal and factual deficiencies in G.O. 20-09 and this Court's uncontested findings that it would have been safe to conduct a jury trial when Mr. Olsen invoked his Speedy Trial Act right, the Court finds that the enumerated impossibility factor and the *Olsen* safety factor weigh heavily in Mr. Olsen's favor.

## C.

The Court, however, cannot stop here.  It must evaluate the other enumerated Speedy Trial Act factor, whether failure to grant a continuance will result in a miscarriage of justice, as well as the other *Olsen* factors.  Though the Court does so, none of them can defeat the strong showing Mr. Olsen has made that his right to a speedy trial has been violated.

---

[19] Attached to this order as Exhibit G is a picture comparing the grand jury room with this Court's courtroom.

The government's argument that the failure to grant a continuance in this case will result in a miscarriage of justice is not persuasive. The government contends that this factor weighs heavily against Mr. Olsen because he faces 34 counts of prescribing pain medications without a legitimate purpose, was granted pretrial bond, and obtained eight continuances including one over the government's objection and because the prosecution "was wholly blameless for the Central District's suspension of jury trials." (Opp. at 6 [citing *Olsen*, 21 F.4th at 1046].) Though this analysis seems to collapse several factors into one, at its crux, the government argues that because the charges against Mr. Olsen are serious, it would be a miscarriage of justice to let this would-be-criminal walk free.

But this analysis overlooks a fundamental tenant of our criminal justice system: Mr. Olsen in the eyes of the law is innocent until proven otherwise. *See Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."); *United States v. Torres*, 955 F.3d 695, 702 (9th Cir. 2021) ("Torres, like all criminal defendants, is presumed innocent until or unless he is convicted of the charged offenses."). Though the charges against Mr. Olsen are serious, no one disputes that they have not been proven. And while the Court would prefer that the government have the opportunity to make its case before a jury, it is a known reality that sometimes the constitutional and statutory protections of the accused prevent the government from doing so. As the Ninth Circuit explained in *Reynolds v. United States*, "[i]t is . . .perfectly plain that the presumption [of innocence], together with the related rule on the burden of proof, in guarding against the conviction of an innocent person, may in some cases prevent the conviction of a person who is actually guilty." 238 F.2d 460, 463 (9th Cir. 1956). "This is a calculated risk which society is willing to take." *Id.*

Though the Court is cognizant of the risks of dismissing the charges against Mr. Olsen, dismissal of the indictment is the very remedy the Speedy Trial Act demands, requiring individuals to go free when the government or the courts infringe upon their constitutional right to a speedy trial.  *Torres*, 995 F.3d at 702 ("If trial does not begin within the requisite time and the defendant moves for dismissal prior to trial, the court must dismiss the indictment.") (citing 18 U.S.C. §3162(a)(2)); *Olsen*, 21 F.4th at 1070 (Collins, J., dissenting) ("[D]ismissal of the indictment, either with or without prejudice, is the mandatory remedy under the Speedy Trial Act for a failure to timely bring the defendant to trial[.]").  The mandatory remedy, combined with the presumption of innocence, allows the Court to comfortably exercise its discretion to afford this factor little, rather than great weight, against Mr. Olsen.

## D.

The Court also affords little weight to another *Olsen* factor—whether Mr. Olsen invoked his right to a speedy trial at the outset of this case.  Though Mr. Olsen's counsel did request eight continuances, each was for a valid and understandable reason.  As the government concedes, the first four continuances were made at the request of Mr. Olsen's former counsel, who needed more time to prepare Mr. Olsen's defense.  After the fourth continuance was granted, Mr. Olsen and his former counsel parted ways, citing irreconcilable differences in strategy, Mr. Olsen's dissatisfaction with the pace of discovery in his case, and Mr. Olsen's inability to continue to pay for his private representation.  Subsequently-appointed counsel from the Federal Public Defender's office naturally required time to prepare Mr. Olsen's defense.  Though she worked diligently, discovery in the case proved complicated.  On more than one occasion, Mr. Olsen's new counsel discovered that the government had provided corrupted files to the defense that needed to be replaced.  Counsel also explained that thousands of documents in discovery consisted of handwritten notes requiring individual, human evaluation.

Complicating things further was the need to vet and prepare an expert witness to combat the government's expert witness.  None of the requested continuances was therefore superfluous, and there is nothing to suggest they were sought for sport rather than to afford Mr. Olsen's counsel adequate time to prepare for trial.

The government's argument that this factor should weigh against Mr. Olsen is troubling to the Court for a separate reason.  It implies that if a defendant does not invoke his right to a speedy trial immediately and consistently, he waives his rights under the Speedy Trial Act and the Sixth Amendment.  But the Supreme Court has unequivocally "reject[ed] . . . the rule that a defendant who fails to demand a speedy trial [at any point in the case] forever waives his right." *Barker*, 407 U.S. at 528*; see United States v. Allen*, 603 F.3d 1202, 1208 n.5 (10th Cir. 2010) ("Filing a motion to continue the trial date is not a waiver of the defendant's Speedy Trial Act rights."); *United States v. Hernandez-Mejia*, 406 F. App'x 330, 337 (10th Cir. 2011) ("Further, that three of the continuance motions were filed on behalf of Mr. Hernandez-Mejia is not a factor in determining whether the Speedy Trial Act was violated . . . .").  To be sure "a defendant has some responsibility to assert a speedy trial claim," and the Court should "weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection," but Mr. Olsen's objection was asserted, forcefully and now repeatedly, demonstrating that it was not merely pro forma. *Barker,* 407 U.S. at 529.

By all accounts, Mr. Olsen was prepared to go to trial in October 2020.  He filed three motions in limine concerning the kinds of evidence to be presented at trial, upon which this Court ruled.  (*See* Dkts. 55, 58, 61.)  When it was clear that Mr. Olsen would not be afforded the trial, he moved to dismiss the charges.  At no point after invoking his right did he waver in his desire to proceed.  Had it not been for G.O. 20-09, a trial would have taken place and a jury would have returned a verdict.

**E.**

Contrary to the government's argument, there is also no reason to weigh the recidivism *Olsen* factor against Mr. Olsen.  In fact, there is no suggestion that Mr. Olsen is at risk of recidivism at all, and the government provides not one iota of evidence that he is.  Mr. Olsen has no criminal history.  As far as this Court is aware, he has never been charged with a crime prior to the government's current case against him.  Simply stated, the government has failed to meet its burden under this factor and therefore the Court will not weigh it against Mr. Olsen.

**F.**

The remaining *Olsen* factors—whether Mr. Olsen was detained pre-trial and the seriousness of the charges—simply cannot overcome the great weight this Court, in its discretion, affords to the Central District's ability to conduct jury trials safely.  Though the restraint on Mr. Olsen's liberty may not be as severe as those in custody awaiting trial, the Supreme Court has repeatedly stated that defendants on bond still suffer the kind of prejudice the Sixth Amendment was designed to protect against—and has gone as far as to say that delay *alone* may violate the Sixth Amendment.  *See Doggett v. United States*, 505 U.S. 647, 657 (1992) ("when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief") (citations omitted).  Indeed, the "Speedy Trial Clause is designed to protect the defendant[,] [in part from] . . . protracted anxiety and concern" over the public accusations he faces.  *United States v. Valentine*, 783 F.2d 1412, 1417–18 (9th Cir. 1986); *see also Barker*, 407 U.S. at 532 ("[E]ven if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.").  In other words, Mr.

Olsen "is not relieved of the limitations based upon his liberty by this prosecution merely because it . . . permits him to go 'whithersoever he will.'  The pendency of the indictment may subject him to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes." *Klopfer*, 386 U.S. at 221–22.  "By indefinitely prolonging this oppression, as well as the 'anxiety and concern accompanying public accusation,'" G.O. 20-09 "clearly denies [Mr. Olsen] the right to a speedy trial . . . guaranteed to him by the Sixth Amendment of the Constitution." *Id.* at 222.

Moreover, though the charges Mr. Olsen faces are serious, he is not accused of violent crimes, which the Ninth Circuit has directed this Court to pay "particular" attention to when deciding the weight of this factor in its discretion. *Olsen*, 21 F.4th at 1046.  Again, this Court also cannot ignore the presumption of innocence Mr. Olsen, like all criminal defendants, enjoys.  The allegations against Mr. Olsen, though significant, have not been proven beyond a reasonable doubt.  Accordingly, the Court in its discretion affords both factors little weight.

## G.

On balance, the ends of justice do not outweigh Mr. Olsen's and the public's right to a speedy trial in this case.  G.O. 20-09 is wholly deficient in its compliance with the strictures of the Speedy Trial Act, and the government concedes that holding jury trials at the time that Mr. Olsen invoked his right would have been safe.  There is also ample evidence to support that proposition, including the government's own convening of the grand jury in the same courthouse where Mr. Olsen's trial would have taken place.  This Court was prepared to take and would have taken every precaution to mitigate the risk COVID-19 posed, just as every state court did within the Central District region and just as the government did when it held grand jury proceedings just floors down from where

this Court sits.  Without any evidence from the government demonstrating that the state court's procedures, or its own procedures regarding grand jury proceedings, would have put the parties, jurors, court staff, and the public at unnecessary risk, there is no legitimate basis to conclude that an ends of justice continuance is appropriate here. Accordingly, the Court turns to the remedy for the delays imposed by G.O. 20-09 on Mr. Olsen's trial.

## VI.

## A.

The law is clear on what the remedy is in this case.  When a defendant is not brought to trial within the seventy-day time limit (minus all properly excludable periods of delay) and brings a motion to dismiss, the court *must* dismiss the indictment.  18 U.S.C. § 3162(a)(2); *see United States v. Medina*, 524 F.3d 974, 980 (9th Cir. 2008).  The strictness of this remedy highlights the importance of the rights it protects.  *See Lloyd*, 125 F.3d at 1268 ("Congress designed the Speedy Trial Act in part to protect the public's interest in the speedy administration of justice, and it imposed the sanction of dismissal under § 3162 to compel courts and prosecutors to work in furtherance of that goal."). The Court therefore has no choice in this matter.  Since Mr. Olsen has not received a jury trial within the time limits afforded by the Speedy Trial Act and the government has not met its burden to demonstrate that the ends of justice outweigh his interest in a speedy trial, the indictment against Mr. Olsen must be dismissed.

//
//
//
//

**B.**

The only issue left to resolve is whether to dismiss the indictment against Mr. Olsen with or without prejudice.  The Court has broad discretion to make this determination.  *Clymer*, 25 F.3d at 831.  "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of justice."  18 U.S.C. § 3162(a)(2).  Upon evaluating these factors, the Court in its discretion finds that the appropriate remedy here is to dismiss the indictment with prejudice.[20]

The facts and circumstances leading to the violation of Mr. Olsen's right to a speedy trial are undoubtedly unique but weigh heavily in favor of dismissing the indictment with prejudice.  In most circumstances, conduct that would warrant dismissing an indictment with prejudice comes at the hands of the government.  Generally, that conduct includes some willful act on the part of the prosecution, but it is simply not the case that a dismissal with prejudice may occur *only* when the government is the source of the violation.  The Speedy Trial Act's provisions do not provide a different remedy when the violation is caused by the government, the presiding court, or the district as a whole.  Rather, the law counsels that each involved entity, not just the government, must abide by the strictures of the Speedy Trial Act and the Sixth Amendment.  *See United States v. Bert*, 814 F.3d 70, 80 (2d Cir. 2016) (noting that the facts and circumstances leading to the delay factor "focuses equally on the impact of the court's conduct and the impact of the government's conduct on any judicial delay").

---

[20] Since this Court has already evaluated the seriousness of the charges against Mr. Olsen, the Court focuses its analysis on the facts and circumstances leading to the dismissal of Mr. Olsen's case and the impact of a re-prosecution on the administration of justice.

In other words, "[d]elay attributable to the trial court, just as delay attributable to the government, weighs in favor of dismissal with prejudice." *United States v. Blank*, 701 F.3d 1084, 1089 (5th Cir. 2012); *United States v. Ramirez*, 973 F.2d 36, 39 (1st Cir. 1992) ("When a STA violation is caused by the court or the prosecutor, it weighs in favor of granting a dismissal with prejudice."). As the Second Circuit explained, "[t]he Act controls the conduct of the parties and *the court itself* during criminal pretrial proceedings. Not only must the court police the behavior of the prosecutor and the defense counsel, it must also police itself." *Bert*, 814 F.3d at 80 (cleaned up) (emphasis added). Further, "[d]istrict courts must hold themselves accountable for ensuring their own compliance with the Speedy Trial Act's requirements." *Id.* Accordingly, "a factually supported finding of a pattern of neglect, thus showing a truly neglectful attitude, *either on the part of the government or the court*, may alone suffice to tip the facts and circumstances factor in favor of dismissal with prejudice." *Id.* at 80–81 (cleaned up) (emphasis added).

Arguably, delays that courts cause are worse than delays the government may cause. Though both the defense and the government have an obligation to conduct themselves ethically, our criminal justice system is inherently adversarial. Adversarial proceedings will necessarily involve instances, hopefully rare instances, in which one party crosses boundaries. But it is up to the courts to ensure that those boundaries are heeded and that justice is meted out appropriately when they are not. It is an entirely different matter when the courts themselves are crossing the constitutional boundaries that they swore an oath to protect. That is because defendants expect, and should receive, protection from the courts.

Here, G.O. 20-09 failed to protect not just Mr. Olsen's rights but the rights of each criminal defendant who invoked their speedy trial rights during the suspension of jury trials. To be sure, "[t]he pandemic is an extraordinary circumstance and reasonable

minds may differ in how best to respond to it." *Olsen*, 21 F.4th at 1049.  However, the Central District's indefinite suspension of criminal jury trials for fourteen consecutive months was anything but reasonable.  As state courts operated and safely held jury trials throughout the Central District, as the government convened and operated the grand jury just floors down from where this Court sits, and as essential and non-essential workers throughout Orange County went to work, the Central District blatantly refused to even consider implementing measures that would have allowed it to conduct jury trials safely.

To be clear, the Court does not fault the Central District for fearing the spread of COVID-19.  The virus was deadly.  Millions lost their lives, and the virus' impact on the United States and the world will be felt for decades to come.  And the Court cannot deny that there is great temptation to excuse the Central District by pointing to the uncertainty and widespread fear of the early days of the pandemic.  But that uncertainty and fear cannot erase the fact that there is simply no legitimate justification for the indefinite nature of the Central District's suspension of jury trials for fourteen months.

As this Court has already explained, an indefinite ends of justice continuance is contrary to well-settled Ninth Circuit law, because such requests must, facially, be "specifically limited in time." *See Clymer*, 25 F.3d at 828.  Moreover, there was no *need* for the suspension to be indefinite for fourteen months.  That is made crystal clear from the government's concession that the safety of conducting a jury trial factor weighs in Mr. Olsen's favor.  All the evidence presented to this Court unequivocally demonstrates that it was safe to hold a jury trial at the time that Mr. Olsen invoked his right, bolstering the government's concession.  And the Central District's failure to respond to that evidence cannot be overlooked.  G.O. 20-09 did nothing but circumvent the strictures of the Speedy Trial Act, the very result that the Ninth Circuit has instructed courts to avoid.  Rather than correct its error and prevent future violations, the Central District allowed G.O. 20-09 to remain in effect, day after day, month after month, until finally it allowed

jury trials to resume in May 2021.  So while it was reasonable to fear the spread of COVID-19, the evidence presented to this Court has made it abundantly clear that the Central District's *reaction* to that fear was unreasonable and indefensible.

The Court also cannot ignore the disastrous implications of G.O. 20-09.  As other circuits have explained, accountability is key when it comes to the Speedy Trial Act to ensure its ongoing effectiveness and power.  Without a check on the conduct of the courts, as well as the government, individual rights may be unconstitutionally infringed indefinitely through a simple majority vote in a process that is neither public nor explained publicly.  But when courts cause violations of constitutional rights, it is imperative that the remedy afforded is proportional to the seriousness of the wrongdoing.  Indeed, "[a] district court may not merely assume responsibility for a speedy trial violation, find no improper motive, and then weigh this statutory factor in favor of dismissal without prejudice without providing further explanation for its determination." *Bert*, 814 F.3d at 80.  Though a dismissal without prejudice is not a toothless sanction, there is no denying that a dismissal with prejudice is an even greater one and would better reflect the gravity of the Central District's conduct in this case.  *See Zedner*, 547 U.S. at 499 (explaining that "dismissal without prejudice" is a "less severe sanction" than "dismissal with prejudice").  Without such a remedy, the court-imposed unconstitutional infringement on a defendant's constitutional right will simply be swept under the rug.

That is not to minimize the crisis that the Central District faced in dealing with coronavirus.  But our history is rife with examples of adherence to the Speedy Trial Act even in the face of crisis.  And the Court is aware of no instance in which a single court, let alone an entire district, reached the result that the Central District did here.  For instance, in *Furlow*, the Ninth Circuit affirmed a district court's decision to find fourteen days excludable when Mount Saint Helens erupted two days before the defendant's scheduled trial date, impacting the court's ability to operate.  644 F.2d at 769.  There, the

district court was confronted with an "incident/accident of earth-shaking effect"—yet it still managed to keep the delay to mere weeks.  Similarly, a district court applied the ends of justice exception to exclude a twenty-day period after the September 11, 2001, terrorist attacks.  *United States v. Correa*, 182 F. Supp. 2d 326, 327 (S.D.N.Y. 2001).  In that case, "as all the world knows, terrorists attacked and destroyed the World Trade Center, less than half a mile from the United States Courthouse," but again the delay was minimal.  *Id.*

Both cases involved unprecedented crises, yet both courts responded not with an indefinite suspension for fourteen months, but with a tailored and narrow approach to overcome the challenges before it.  Whether it be a volcanic eruption, a terrorist attack, or a global pandemic, the Speedy Trial Act and the Constitution apply in full force.  At the very least, the Central District had an obligation to try harder, and though it may not be the government's fault that the Central District did not, the abdication of judicial policing "tip[s] the facts and circumstances factor in favor of dismissal with prejudice." *Bert*, 814 F.3d at 80–81.

The administration of justice also compels dismissing the indictment with prejudice.  As this Court explained in its first order, the suspension of jury trials caused crowding and prolonged lockdowns in federal detention facilities and jails, increasing the risk of those incarcerated of contracting COVID-19.  The problem grew to be so severe that individuals charged with crimes in California and whose families and lawyers were in California were transported without notice to Arizona because there was not enough bed space in the Central District to house them.  *See, e.g., United States v. Jenkins*, No. 20-cr-00068-CJC-1 (Dkt. 41) (Sept. 2, 2020) (Order Granting Defendant's Ex Parte Application for Immediate Transfer from the San Luis Detention Center in Arizona to the Metropolitan Detention Center in California).  These moves interfered with defendants' ability to confer with their counsel and to prepare for trial, impeding not only the

defendants' right to a speedy trial but also their right to effective assistance of counsel. *See, e.g., id.* (Dkt. 36) (Ex Parte Application for Transfer, explaining that "Mr. Jenkins has now been removed from geographic proximity to defense counsel, potential witnesses, and family and friends who can facilitate communication with potential witnesses").

And as the Court explained in its prior order, even more disturbing is the fact that the government offered favorable deals to defendants to incentivize them to plead guilty. Reports from the U.S. Attorney's Office for the Central District show that the office had nearly three times the number of cases in the pre-trial phase and only about half the cases in the pre-sentencing phase in 2020 as compared to a similar period in 2019. Consequently, it authorized AUSAs to offer two-level variances under the Sentencing Guidelines to many defendants so long as they waived their right to in-person hearings, signed plea agreements quickly (before October 16, 2020), and entered their plea at the first date ordered by the court. *See, e.g., United States v. Ruiz*, No. 20-cr-00019-CJC-6 (Dkt. 540) (Sept. 17, 2020) (Plea Agreement where the defendant consented to video hearings under the CARES Act and the government agreed to recommend a two-level reduction in the applicable Sentencing Guidelines offense level, a term of imprisonment no higher than the low end of the applicable guideline range, and that the defendant not be required to self-surrender until after February 1, 2021). In other words, the government offered very favorable plea deals based not on the defendant's individual circumstances, but rather based on exigencies manufactured by the Central District's refusal to resume jury trials. Reprosecuting Mr. Olsen would do nothing to promote the administration of justice. Dismissing the indictment against him with prejudice, however, will deter the Central District from thwarting it ever again.

# C.

*"Trial by jury cannot be considered as a natural right, but a right resulting from a social compact which regulates the action of the community, but is as essential to secure the liberty of the people as any one of the pre-existent rights of nature."*

– James Madison[21]

The Sixth Amendment as implemented by the Speedy Trial Act guarantees every accused the right to a speedy trial before an impartial jury.  Mr. Olsen, even though he stands accused of serious charges, is entitled to that constitutional protection, as are all other criminal defendants, and there is no exception to that rule in the Constitution when the country is in a time of crisis.  Indeed, it is in times of crisis that courts must be the most vigilant in safeguarding the Constitution.  *See Roman Catholic Diocese*, 141 S. Ct. at 68.  "[W]e may not shelter in place when the Constitution is under attack.  Things never go well when we do."  *Roman Catholic*, 141 S. Ct. at 71 (Gorsuch, J., concurring).  Here, the Central District's indefinite suspension of jury trials for fourteen months, its failure to account for why the grand jury could operate but jury trials could not, its failure to consider the precautions implemented by the state courts in the Central District region when conducting jury trials, its failure to consider that both non-essential and essential businesses were operating in Orange County, and its failure to consider the guidance of local public health officials, was an abdication of its duty to defend and protect the constitutional right of the accused to a speedy trial under the Sixth Amendment and the Speedy Trial Act.  Accordingly, the indictment against Mr. Olsen now must be dismissed with prejudice.

//

//

---

[21] 1 Annals of Cong. 454 (1789) (Joseph Gales ed., 1834) (proposing Bill of Rights as amendments to the Constitution).

## VII.

For the foregoing reasons, the Court **DISMISSES** the indictment against Mr. Olsen **WITH PREJUDICE** and **EXONERATES** his bond.


DATED:      August 22, 2022

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

## INDICTMENTS RETURNED IN SOUTHERN DIVISION
### June 24, 2020 through December 9, 2020

| | Date Indictment Filed | Case Number | Case Name | Notes |
|---|---|---|---|---|
| 1 | June 24, 2020 | 8:20-cr-00077-JLS | USA v. Martinez, et al. | |
| 2 | | 8:20-cr-00078-DOC | USA v. Jorgo | |
| 3 | | 8:20-cr-00079-JVS | USA v. Staples | |
| 4 | | 8:20-cr-00002(A)-DOC | USA v. Le, et al. | 1st Superseding Indictment |
| 5 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 6 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 7 | | 5:20-cr-00123-JGB | USA v. Renteria | |
| 8 | | 5:20-cr-00124-JGGB | USA v. Gil-Carranza, et al. | |
| 9 | | 8:20-cr-00083-DOC | USA v. Do | |
| 10 | | 8:20-cr-00084-DOC | USA v. Tran, et al. | |
| 11 | July 22, 2020 | 8:20-cr-00091-JVS | USA v. Memije | |
| 12 | | 5:20-cr-00132-JGB | USA v. Moore, et al. | |
| 13 | | 8:20-cr-00090-JLS | USA v. Nunez | |
| 14 | | 8:20-cr-00089-JLS | USA v. Rangel | |
| 15 | | 2:19-cr-00756(A)-JAK | USA v. Ryan, et al. | 1st Superseding Indictment |
| 16 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 17 | | 8:20-cr-00097-JLS | USA v. Villa | |
| 18 | | 5:20-cr-00138-PA | USA v. Garcia | |
| 19 | | 8:19-cr-00208(A)-DOC | USA v. Pongsamart | 1st Superseding Indictment |
| 20 | | 8:20-cr-00098-JLS | USA v. Gonzalez | |
| 21 | August 12, 2020 | 8:20-cr-00104-DOC | USA v. Flores | |
| 22 | | 8:20-cr-00105-JVS | USA v. Fernandez | |
| 23 | | 8:20-cr-00106-JVS | USA v. Spagnolini | |
| 24 | | 8:20-cr-00107-JLS | USA v. Kuhns | |
| 25 | | 8:20-cr-00108-JVS | USA v. Anderson | |
| 26 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 27 | Sept. 16, 2020 | 8:20-cr-00133-AB | USA v. Lewis, et al. | |
| 28 | | 8:20-cr-00134-SVW | USA v. Ramirez | |
| 29 | | 8:20-cr-00135-ODW | USA v. Chacon | |
| 30 | | 8:20-cr-00136-SVW | USA v. Mitchell | |
| 31 | | 8:20-cr-00137-DSF | USA v. Van Dyke | |
| 32 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 33 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 34 | Sept. 30, 2020 | 8:20-cr-00140-VAP | USA v. Hicks | |
| 35 | | 8:20-cr-00141-JAK | USA v. Jeffries | |
| 36 | | 5:20-cr-00186-DMG | USA v. Jones | |
| 37 | | 5:20-cr-00187-PA | USA v. Lawhead | |
| 38 | | 8:20-cr-00142-SB | USA v. Wampler | |
| 39 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 40 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 41 | REDACTED | REDACTED | REDACTED | Filed Under Seal |

| | Date Indictment Filed | Case Number | Case Name | Notes |
|---|---|---|---|---|
| 42 | October 14, 2020 | 8:20-cr-00152-JVS | USA v. Swain | |
| 43 | | 8:20-cr-00153-CJC | USA v. Pham | |
| 44 | | 8:20-cr-00154-PA | USA v. Arias | |
| 45 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 46 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 47 | October 28, 2020 | 8:20-cr-00160-RGK | USA v. Chavez, et al. | |
| 48 | | 8:20-cr-00161-PA | USA v. Talamantes | |
| 49 | | 8:20-cr-00162-SB | USA v. Rangel | |
| 50 | November 4, 2020 | 8:20-cr-00169-JVS | USA v. Miramontes | |
| 51 | | 8:20-cr-00170-CJC | USA v. Hall | |
| 52 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 53 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 54 | | 8:20-cr-00177-DSF | USA v. Vargas-Fentanes | |
| 55 | | 8:20-cr-00178-MWF | USA v. Garcia | |
| 56 | | 8:20-cr-00179-GW | USA v. Oquendo | |
| 57 | December 2, 2020 | 8:20-cr-00183-JVS | USA v. Crow | |
| 58 | | 8:20-cr-00184-CJC | USA v. Lee | |
| 59 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 60 | December 9, 2020 | 8:20-cr-00189-GW | USA v. Zermeno | |
| 61 | | 8:20-cr-00190-PA | USA v. Hall | |
| 62 | | 8:20-cr-00191-JFW | USA v. Procopio | |
| 63 | | 8:20-cr-00192-VAP | USA v. Cerda | |
| 64 | | 8:20-cr-00193-RGK | USA v. Roche | |
| 65 | REDACTED | REDACTED | REDACTED | Filed Under Seal |

# EXHIBIT B



**United States District Court**
Central District of California
**Office of the Clerk**

**Michelle A. Carey**
Chief Probation and Pretrial Services Officer
300 North Los Angeles Street, Suite 1300
Los Angeles, CA 90012

**Kiry K. Gray**
District Court Executive / Clerk of Court
350 West 1st Street, Suite 4311
Los Angeles, CA 90012

**Cristina M. Squieri Bullock**
Chief Deputy of Administration
350 West 1st Street, Suite 4311
Los Angeles, CA 90012

**Sara Tse Soo Hoo**
Chief Deputy of Operations
255 East Temple Street, Suite TS-134
Los Angeles, CA 90012

Dear Summoned Juror:

The United States District Court for the Central District of California recognizes that the COVID-19 pandemic has impacted everyone and created difficult times for many. To ensure you answer this call as a summoned juror without unnecessary risk and to provide you with peace of mind knowing that we are committed to your safety and well-being, the Court has implemented important health and safety precautions, including the following:

- All individuals, except those who are exempt, must wear face coverings in order to enter the courthouse.
- Following CDC guidelines, we have placed social distancing signage and demarcations throughout the courthouse, including the jury assembly areas and courtrooms.
- We will make available face shields and disposable masks for prospective jurors. We will provide jurors with Personal Protection Equipment (PPE) including disinfectant spray and hand sanitizer.
- Enhanced cleaning of the courthouse is repeated throughout the day.
- We are reducing building occupancy by holding telephonic and video proceedings where possible and maximizing telework by our staff.

The Court will do its part to ensure this is a healthy and safe environment for you to fulfill your civic duty as a citizen of the United States. You can do your part by immediately completing your juror qualification online.  If you do not have access to a computer, you may request a questionnaire in paper format by calling (855) 872-0933.

To accommodate jurors who have been impacted by the pandemic, you will have an opportunity to request to be postponed or excused from jury service on the questionnaire. You may also request a postponement or excusal through the court's website after submitting your questionnaire if your circumstances have changed. Your request to be postponed or excused from jury service should be submitted as soon as possible and before you report.

**Eastern Division**
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Southern Division**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701

Do not report to the courthouse if you have symptoms of COVID-19 (e.g., fever, cough, shortness of breath, and body aches) or if you have tested positive for COVID-19 within 14 days of your scheduled report date. Immediately call the jury assembly room at the number listed on your summons.

Thank you in advance for your service.  We are grateful for your commitment to the justice system.

Sincerely,

Kiry K. Gray
Clerk of Court/District Court Executive

# Exhibit C

## U.S. District Court for the Central District of California

## COVID-19 Supplemental Juror Questionnaire

The safety of jurors, staff and the public remain the Court's overriding priority. To prevent the spread of COVID-19 and reduce the potential risk of exposure at our courthouses, we are conducting a simple screening questionnaire. Your participation is important to help us take precautionary measures to protect you and everyone in our courthouses. You may answer the questions by logging onto your online profile at https://ecf.cacd.uscourts.gov/e-juror, or you may complete this form and return it in the enclosed postage-paid envelope within 48 hours. If, at any time after completing and returning the questionnaire, your answers to any of the questions change, please contact the Jury Department immediately.

| NAME: | |
|---|---|
| PARTICIPANT NUMBER: | PHONE NUMBER: |

| | Supplemental Screening Questionnaire | |
|---|---|---|
| 1 | Have you been diagnosed with, or had close contact with, anyone who has been diagnosed with COVID-19 within the last 14 days? <br><br> Yes ☐    No ☐ |
| 2 | Have you experienced any cold or flu-like symptoms in the last 14 days (including fever, cough, sore throat, respiratory illness, difficulty breathing, chills, muscle pain, or lost of taste or smell)? <br><br> Yes ☐    No ☐ |
| 3 | Would you like to be considered for deferral of service because you are over age 65, or a person of any age with an underlying medical condition that puts you at a higher risk of developing serious health complications from COVID-19? <br><br> Yes ☐    No ☐ |
| 4 | Would you like to be considered for deferral of service because you live with or provide direct care for a vulnerable person or because you work in the medical field? <br><br> Yes ☐    No ☐ |
| 5 | Would you like to be considered for deferral of service because you have children at home who require your direct supervision due to school and/or daycare closures? NOTE: Only answer YES, if there is NO ONE else in the household who can provide care during your jury service. <br><br> Yes ☐    No ☐ |

If you answer "yes" to any of the above questions, your questionnaire will be reviewed for deferral of jury service. If you provided an email address at the time you submitted your online questionnaire, the court will notify you via email if you have been deferred. If you mailed your questionnaire, please call 1(800) 327-3296 the night before your report date for confirmation of your deferral. Jurors who are deferred will receive a new summons for a future date. Any questions should be directed to jury@cacd.uscourts.gov or (213) 894-3604.

Signature: _____    Date: _____

# EXHIBIT D



# EXHIBIT E



# EXHIBIT F



# EXHIBIT G

**Photograph of Conference Room 3055 on Floor 3 of the Ronald Reagan Federal Building and United States Courthouse.**



**The dimensions of Room 3055 according to the Government Service Administration are 20' x 26'.**

**Photograph of Courtroom #9B in the Ronald Regan
Federal Building and United States Courthouse of the
Central District of California.**



**The dimensions of Courtroom #9B according to the Government Service
Administration are 48'.6 1/2" x 44'.4".**



JUDGE'S ENTRY

CR #9B (CARNEY)

**44'-4"**

VEST

CONF.
ROOM

CONF.
ROOM